In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00149-CV


______________________________




LARBI ETTAHALI AND MOHAMMED ZARWAL, Appellants



V.



BONNIE S. FULBRIGHT, Appellee




 


On Appeal from the County Court at Law No. 2


Harris County, Texas


Trial Court No. 754,873




 




Before Morriss, C.J., Ross and Carter, JJ.


Memorandum Opinion by Justice Ross



MEMORANDUM OPINION



 Larbi Ettahali and Mohammed Zarwal have appealed from a verdict taken against
them in a jury trial. A cross-appeal was also filed by Fulbright. The judgment was signed
July 12, 2002, and the record was thus due on or before September 10, 2002. The clerk's
record was timely filed. Neither the appellant nor the cross-appellant requested or paid for
the preparation of a reporter's record. 

 On December 20, 2002, we directed all parties to provide this Court with information
showing they were making an effort to pursue an appeal by either obtaining a reporter's
record or by filing an appellant's brief based on the clerk's record alone. At that time, we
warned all parties that if, on or before January 10, 2003, they did not provide this Court
with information showing they desired to pursue the appeal, the appeal would be subject
to dismissal for want of prosecution pursuant to Tex. R. App. P. 38.8(a)(1).

 Neither party has contacted this Court. We find that their failure to pursue the
appeal constitutes a failure to prosecute the appeal. See Tex. R. App. P. 42.3(b), (c). 

 We dismiss the appeal for want of prosecution. 


 Donald R. Ross

 Justice


Date Submitted: January 21, 2003

Date Decided: January 22, 2003



ay\
direct.
\
\
Tex. R. Civ. P. 21a.
\
'

var WPFootnote4 = '
Plaintiffs did ultimately cause a new citation, with their fifth amended original\
petition, to be served on McNew by the Secretary of State. The return on this citation,\
however, was not filed until after the trial court had struck McNew as a party.
\
'

function WPShow( WPid, WPtext )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'visible'" );
 else
 {
 if( floatwnd == 0 || floatwnd.closed )
 floatwnd = window.open( "", "comment", "toolbars=0,width=600,height=200,resizable=1,scrollbars=1,dependent=1" );
 floatwnd.document.open( "text/html", "replace" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( "\r\n" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( WPtext );
 floatwnd.document.write( '
Close');
 floatwnd.document.write( "
" );
 floatwnd.document.close();
 floatwnd.focus();
 }
}

function WPHide( WPid )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'hidden'" );
}



















In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00083-CV
______________________________


SOUTHWEST CONSTRUCTION
RECEIVABLES, LIMITED, ET AL., Appellants
 
V.
 
REGIONS BANK, f/k/a FIRST COMMERCE BANK, ET AL., Appellees


                                              

On Appeal from the 202nd Judicial District Court
Bowie County, Texas
Trial Court No. 99C0985-202


                                                 



Before Ross, Carter, and Cornelius,* JJ.
Opinion by Justice Ross
*William J. Cornelius, C.J., Retired, Sitting by Assignment


O P I N I O N

          Dan Moore, D.D.S., and Dennis O'Banion, M.D., and their two companies,
Southwest Construction Receivables, Limited (SCR) and Construction Invoice Funding,
Ltd. (collectively, Appellants) sued Regions Bank and several individuals, including Charles
William Richardson, for fraud, breach of contract, and civil conspiracy. Some of the
defendants, including Regions and Richardson, filed motions for partial, traditional, and
no-evidence summary judgment, which the trial court ultimately granted. The trial court
also ruled that, as a matter of law, one of the individual defendants, Michael McNew, had
not been properly served and was, therefore, not before the court. The plaintiffs nonsuited
much of the remainder of their case and appealed those rulings by the trial court.
          In their third issue, Appellants contend the trial court erred by ruling, as a matter of
law, that McNew had not been served with the plaintiffs' original or amended petitions and
was, therefore, not properly before the trial court. We hold the trial court did so err. 
Because we conclude McNew is a party to this case, and because claims against him have
not been resolved by way of a final judgment, the appeal is now interlocutory, and we lack
jurisdiction to consider the remainder of Appellants' points of error. Accordingly, we sustain
Appellants' third point of error and dismiss the remainder of the appeal for want of
jurisdiction.
I. Procedural and Factual History
          In the late 1990s, Drs. Moore and O'Banion of Texarkana were introduced to the
"factoring" business by McNew and Joe O'Banion (Dr. O'Banion's brother). "Factoring" is
the business of "buying of accounts receivable at a discount. The price is discounted
because the factor (who buys them) assumes the risk of delay in collection and loss on the
accounts receivable." Black's Law Dictionary 630 (8th ed. 2004). In this case,
Drs. Moore and O'Banion purchased accounts receivable from construction subcontractors
that were owed money by their respective general contractors. 
          In 1997, Drs. Moore and O'Banion created SCR. The doctors borrowed money from
First Commercial National Bank to fund their new company. The doctors worked with Joe
O'Banion and McNew, who brokered accounts receivable to the doctors and SCR. 
Working through a company owned by McNew and Joe O'Banion called Funding Sources
Support, Inc. (FSSI), McNew was supposed to conduct a background check on each
account receivable that he brokered (a process the parties refer to as "due diligence"
processing) to ensure both that the work represented by each account receivable had, in
fact, been completed by the subcontractor and that the money was due to be paid by the
general contractor within ninety days. As a condition of loaning money to SCR, First
Commercial National Bank also required of SCR that the bank be allowed to conduct its
own due diligence check of each account receivable to be purchased, as required by
banking regulations and the bank's internal policies. For a while, all the
parties—Drs. Moore and O'Banion, First Commercial National Bank, McNew and Joe
O'Banion, and the subcontractors—seemed to be making a profit.
          In July 1998, Regions Bank of Little Rock, Arkansas, acquired First Commercial
National Bank. Shortly before then, McNew had encouraged the doctors to purchase,
through SCR, a number of additional accounts receivable from Starkey Electric, an
electrical subcontractor based in Tyler, Texas. McNew had also encouraged another
investor, Richardson—who was the owner of Southwest Financial Funding (SWF) and a
Regions customer—to increase SWF's factoring investment in Starkey Electric and other
companies McNew had suggested. 
          In August 1998, SWF applied to have its credit line increased by Regions. Regions
assembled a team of executives from various branch offices to review SWF's application. 
One of those executives was Neil West, an official with a Regions branch in Tyler, Texas. 
In reviewing SWF's application, West noticed that SWF planned to buy several accounts
receivable from Starkey Electric of Tyler. This concerned West because he had
experienced problems with Starkey Electric when West had worked for another bank in the
Tyler area.
          On August 30, 1998, West apprised others within Regions of his suspicions, stating
he believed Starkey—and possibly others—were engaging in fraud by trying to sell "bogus"
accounts receivable to SWF. West outlined several accounts receivable that SWF's credit
extension application proposed buying from Starkey Electric. West's written memorandum
about the Starkey invoices then detailed why West believed certain of those invoices were
fraudulent: the invoices were for work that was either not fully completed or had not yet
commenced. West then concluded that, because SWF was already heavily invested in
Starkey invoices, and because the value of those invoices already owned by SWF was
likely to be less than the money SWF ultimately realized in payments from the general
contractors, further funding by Regions of SWF's investments in Starkey Electric was not
in the bank's best interest. "[A]t this point every advance we [Regions] make, particularly
with Starkey as the beneficiary, widens the gap by increasing the loss exposure." "SWF
is a house of cards ready to collapse without substantial capital input—maybe the entire
$3.7MM [sic] Starkey owes plus any other scams that we [Regions] don't know about." 
          On September 4, 1998, McNew met with Regions officials and admitted that some
of the Starkey invoices—for which Regions had already advanced money to Richardson
(and SWF) and which Richardson had, in turn, paid to Starkey—were for work that had not
yet been completed. McNew and bank officials identified approximately $695,000.00 worth
of problem invoices. Regions then demanded it be paid by McNew for those identified,
problem invoices within a short period of time. 
          Shortly thereafter, McNew obtained money from other sources. These sources
were Drs. Moore and O'Banion, and SCR. Drs. Moore and O'Banion borrowed money and
deposited that money into SCR's checking account, to which McNew had access. McNew
then took $495,000.00 of SCR's money, added $200,000.00 of his own money, and paid
$695,000.00 to Regions for the identified, problem invoices from Starkey Electric. This
payment, made in response to Regions' demand, absolved Regions' potential losses
associated with the previously identified $695,000.00 worth of problem invoices from
Starkey Electric.
          McNew was ultimately convicted on federal charges of wire fraud, bank fraud,
making a false statement to a financial institution, mail fraud, and conspiracy. At the
federal plea, McNew admitted he led Drs. Moore and O'Banion to believe they were buying
new invoices when, in fact, he knew that representation was not true. Instead, McNew
used the $495,000.00 from the doctors to repurchase the problem invoices from
SWF—invoices McNew and Regions both knew were for work that had not been
completed or that they suspected to be fraudulent. 
          On November 18, 1998, Regions executed a "Release of Security Interest" in these
Starkey Electric invoices that Regions had reason to believe had either been paid in full or
were fraudulent. Regions and FSSI also mutually released each other from any claims
relating to certain Starkey Electric invoices; Regions promised not to disclose any of FSSI's
activities to law enforcement, except where required by law. 
II. Did the Trial Court Err By Striking McNew As a Party to the Lawsuit?
          In their third point of error, Appellants contend the trial court erred by holding, as a
matter of law, McNew had not been properly served with either the plaintiffs' original
petition or any amended petition. In the spring of 2003, Richardson asked the trial court
to find that McNew had not been properly served with the plaintiffs' original petition. The
trial court ruled May 13, 2003, that McNew was not properly before the court; it followed
with a written order June 27, 2003, which stated there had been "no service on Michael L.
McNew that validly makes him a party to this case." The effect of the trial court's order was
to eliminate McNew as a party to the case. This ruling hurt the plaintiffs' case because
McNew, the alleged primary malfeasant (and now federally convicted criminal), was a
necessary party to prove the plaintiffs' claims of conspiracy against the remaining
defendants. See, e.g., Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667, 675 (Tex. 1998)
(element of civil conspiracy is combination of two or more persons).



          Generally, only the entity that has not been properly served has standing to
challenge the lack of due process. See, e.g., Illinois v. DeLaire, 610 N.E.2d 1277,
1287–88 (Ill. App. Ct. 1993) (third party has right to contest effectiveness of service, but
not defendants). One exception to that general principle is that an insurance company
may challenge the propriety of service as to the company's insured. See, e.g., Koven v.
Saberdyne Sys., Inc., 625 P.2d 907, 909–10 (Ariz. Ct. App. 1980) (insurance company had
standing to move trial court to set aside default judgment against insured based on lack
of service of plaintiff's petition for personal injuries occurring at amusement park).
          With the single exception of an insurance company standing in the shoes of its
insured, we have found nothing in our statutes or Texas caselaw that supports
Richardson's position that a defendant in a civil suit has standing to challenge whether a
codefendant has been properly served; nor have the parties directed this Court's attention
to any such authority. Therefore, we conclude Appellants are correct: only McNew has
standing to challenge whether he has or has not been properly served. Cf. Caldwell v.
Barnes, 154 S.W.3d 93, 97–98 (Tex. 2004) (burden is on nonserved party to prove
nonservice in post-judgment bill of review proceeding). The remaining codefendants have
no such standing. Because the trial court struck McNew as a party on the motion of a
codefendant, the trial court erred.
          Moreover, the record before us shows Appellants served the Texas Secretary of
State (as the agent of process for McNew, an Arkansas resident) with the original petition. (a) The secretary of state is an agent for service of process or complaint
on a nonresident who:
 
(1) is required by statute to designate or maintain a resident agent or
engages in business in this state, but has not designated or maintained
a resident agent for service of process;
 
. . . .
 
(b) The secretary of state is an agent for service of process on a
nonresident who engages in business in this state, but does not maintain a
regular place of business in this state or a designated agent for service of
process, in any proceeding that arises out of the business done in this state
and to which the nonresident is a party.
 
Tex. Civ. Prac. & Rem. Code Ann. § 17.044 (Vernon 1997) (Texas' "long-arm" statute). If
service is effected via the Secretary of State pursuant to Texas' long-arm statute, absent
evidence of fraud or mistake, the Secretary of State's certificate of service "conclusively
establishes that process was served." Campus Invs., Inc. v. Cullever, 144 S.W.3d 464,
466 (Tex. 2004) (citing Capitol Brick, Inc. v. Fleming Mfg. Co., 722 S.W.2d 399, 401 (Tex.
1986)); Zuyus v. No'Mis Communications, Inc., 930 S.W.2d 743, 746 (Tex. App.—Corpus
Christi 1996, no writ).
          In this case, the Texas Secretary of State accepted service of process, as the agent
for nonresident McNew, of the plaintiffs' original petition. The Secretary of State then
forwarded that notice to McNew's last known address in Arkansas. The plaintiffs had
similarly served FSSI, an Arkansas corporation owned by McNew, via the Texas Secretary
of State. The record shows McNew's last known address and FSSI's last known address
are the same location. The Secretary of State's certification of service shows the certified
letter to McNew went "unclaimed" and was returned to the Secretary August 20, 1999, but
the certified letter to FSSI was accepted and the return receipt was received by the
Secretary August 20, 1999. Appellants contend this constitutes "selective acceptance" by
McNew. We tend to agree.


 However, such conclusion is not necessary in light of the
Texas Supreme Court's holding in Campus Investments. 
          Regions and Richardson point out that Appellants amended their original petition
multiple times, adding plaintiffs (Drs. Moore and O'Banion), new claims, and new damages. 
Citing Weaver v. Hartford Accident & Indem. Co., 570 S.W.2d 367, 370 (Tex. 1978), they
contend that, because McNew had not made an appearance in the case at the time of
these amendments, Appellants were required to have a new citation issued on their "live"
pleading and served on McNew. Appellants' "live" pleading at the time the trial court struck
McNew as a party was Plaintiffs' fifth amended original petition, filed December 13, 2001. 
          A plaintiff who amends its petition may serve the defendant, without regard to
whether the amendment seeks a more onerous judgment or adds a new cause of action,
by complying with the filing and serving requirements of Rules 21 and 21a, Texas Rules
of Civil Procedure.


 In re R.D.C., 912 S.W.2d 854 (Tex. App.—Eastland 1995, no writ). 
The record before us shows that Appellants served McNew with Plaintiffs' fifth amended
original petition by certified mail May 5, 2003.
          As the Eastland court pointed out in R.D.C., Weaver was a liability insurance
coverage case holding that the insurance company had no duty to defend a suit against
the named insured's employee where the employee failed to comply with the policy
provisions regarding the forwarding of citation to the insurer. The Eastland court went on
to state:
While the rule [that new citation is necessary for a party who has not
appeared when the plaintiff, by amended petition, seeks a more onerous
judgment than prayed for in the original pleading] was discussed in Weaver,
it is apparent that the thrust of the opinion is directed at the failure of the
"omnibus insured" to comply with the policy provisions.

Id. at 855.

          Citing Baker v. Monsanto Co., 111 S.W.3d 158 (Tex. 2003), Regions and
Richardson further contend that, because Drs. Moore and O'Banion were not added as
plaintiffs in the case until Plaintiffs' second amended original petition, filed February 2,
2001, these doctors were "intervenors" and were therefore required to serve McNew with
a new citation. In Baker, the defendant, Monsanto Co., had not been served with citation
by any plaintiff when the intervenors attempted to serve Monsanto's counsel. Id. at 159. 
The law firm representing Monsanto expressly stated in a letter that they would not accept
service on Monsanto's behalf. Plaintiffs subsequently served citation on Monsanto. 
Monsanto's counsel filed an answer, but only to "the petitions of those plaintiffs who have
served Monsanto." Id. The Texas Supreme Court held that Monsanto's subsequent
appearance relieved the intervenors of serving Monsanto with a new citation. In so
holding, the Texas Supreme Court quoted approvingly: 
Citation is necessary when the intervenor asks affirmative relief against a
defendant who has not appeared or a plaintiff who does not, by any action
subsequent to the intervention, appear thereon. . . . 1 McDonald and
Carlson, Texas Civil Practice § 5:81 at 609 (1992 ed.). 

Id. at 160 (emphasis added).

          It is apparent the "by any action subsequent to the intervention" language is directed
toward plaintiffs because plaintiffs will always have already made an appearance in the
case. This language is equally applicable, however, to defendants who, like McNew, have
been previously served with citation but have not entered a formal appearance in the case. 
Such defendants may, "by [their] action subsequent to the intervention," make issuance
of a new citation unnecessary. Such was the case with McNew. 
          Unlike Monsanto in Baker, where Monsanto unsuccessfully sought to invoke the
statute of limitations because it had not been formally served with citation by the
intervenors, the record before us shows that McNew never denied his status as a
defendant in this case. After Drs. Moore and O'Banion were joined as plaintiffs, McNew
appeared "at the instance of the plaintiffs" and gave testimony in the form of an oral
deposition. Richardson's motion for summary judgment included an attached excerpt that
shows McNew was questioned in that deposition concerning the claims of Drs. Moore and
O'Banion. 
          Further, McNew participated in a full evidentiary hearing in U.S. Bankruptcy Court
on Appellants' motion for relief from stay to allow the trial of the instant case to proceed
based on Plaintiffs' fifth amended original petition. The bankruptcy court's order, dated
July 1, 2002, granting this motion, reflects that McNew opposed the motion on various
grounds, but lack of service was not one of them. Rather, the order reflects that McNew
admitted and pled guilty to the specific conduct complained of in Plaintiffs' fifth amended
original petition. Referring to the instant litigation, the order also contains the following
judicial finding:
[McNew] has been aware of the litigation and the complaints against him for
several years, and due to his guilty plea in the criminal case and admissions
in his civil deposition, it does not appear that [McNew] has a viable defense
in any case. 

          Based on these actions by McNew after Drs. Moore and O'Banion were joined as
plaintiffs, and based on the original service of citation properly served on him by the
Secretary of State, we hold that a new citation was not required and that notice of the
additional plaintiffs' claims, given pursuant to Rules 21 and 21a, was sufficient.



          Therefore, even if the trial court had authority to strike McNew as a party based on
the motion of a codefendant, the trial court nonetheless erred because the record
affirmatively refutes the claims of Regions and Richardson that McNew had not been made
a party to the suit. We sustain Appellants' third point of error.
III. The Appeal Is Now Interlocutory
          In their fifth amended petition, the plaintiffs sued Regions Bank, McNew, Michael
Starkey (owner of Starkey Electric), Richardson, J. Ronald Burke (Richardson's business
partner), and Joe O'Banion. The plaintiffs alleged the defendants were collectively and
separately guilty of fraud, aiding and abetting a breach of fiduciary duty, and civil
conspiracy. The plaintiffs sought actual and punitive damages, as well as court costs and
pre- and post-judgment interest. 
          In their notice of partial nonsuit, the plaintiffs took a nonsuit with respect only to their
claims of direct fraud ("save and except those claims already adjudicated by partial
summary judgment") and their claims of aiding and abetting a breach of fiduciary duty
against Regions, Richardson, and a third defendant ("save and except those claims
already adjudicated by partial summary judgment"). The notice of partial nonsuit did not
address Appellants' claims against NcNew. 
          "[T]he general rule, with a few mostly statutory exceptions, is that an appeal may be
taken only from a final judgment." Lehmann v. Har-Con Corp., 39 S.W.3d 191, 195 (Tex.
2001). "A judgment is final for purposes of appeal if it disposes of all pending parties and
claims in the record, except as necessary to carry out the decree." Id. Except for those
statutory exceptions, if the judgment from which the party has appealed does not dispose
of all pending parties and claims, then the judgment is deemed to be "interlocutory" and
the court of appeals should either abate the case or dismiss it for want of jurisdiction. Id.
at 195–96.
          Because we have held the trial court erred by ruling, as a matter of law, that McNew
was not a proper party to the suit, and because Appellants' notice of nonsuit did not resolve
their claims against McNew, the trial court's award of summary judgment in this case does
not dispose of all the parties or claims. None of the statutory exceptions that grant us
jurisdiction to hear certain interlocutory appeals are applicable to this case. See Tex. Civ.
Prac. & Rem. Code Ann. § 51.014 (Vernon Supp. 2004–2005). Therefore, we are without
jurisdiction to consider Appellants' remaining points of error. Cf. Brooks v. Pep Boys Auto.
Supercenters, 104 S.W.3d 656, 660–61 (Tex. App.—Houston [1st Dist.] 2003, no pet.)
(order compelling arbitration not final disposition and not expressly authorized for
interlocutory appeal; appellate court dismissed appeal).
IV. Conclusion
          For the reasons stated, we sustain Appellants' third point of error and dismiss the
appeal for want of jurisdiction.
 

                                                                           Donald R. Ross
                                                                           Justice


Date Submitted:      February 16, 2005
Date Decided:         April 26, 2005